## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ERNESTINE MOORE,** | ) | |
| | ) | **No. 15 CV 8341** |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | **November 30, 2016** |
| | ) | |

## MEMORANDUM OPINION and ORDER

Ernestine Moore filed applications for Disability Insurance Benefits ("DIB")
and Supplemental Security Income ("SSI") under Titles II and XVI of the Social
Security Act ("the Act"), claiming that the combination of her degenerative joint
disease and obesity renders her unable to perform full-time work. After the
Commissioner of Social Security issued a final decision denying her applications,
Moore filed the current lawsuit seeking judicial review. *See* 42 U.S.C. §§ 405(g);
1383(c)(3). Before the court are the parties' cross-motions for summary judgment.
For the following reasons, Moore's motion is denied, the government's is granted,
and the Commissioner's final decision is affirmed:

## Background

Moore filed her SSI and DIB applications in January 2012, claiming a
disability onset date of February 28, 2009. (Administrative Record ("A.R.") 160-72.)
After her applications were denied initially and upon reconsideration, (id. at 89-92),

Moore sought and received a hearing before an administrative law judge ("ALJ"), (id. at 32-88). On March 26, 2014, the ALJ issued a decision concluding that Moore is not disabled within the meaning of the Act. (Id. at 13-27.) The Appeals Council declined Moore's request for review, (id. at 1-6), making the ALJ's decision the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Moore timely filed this lawsuit seeking judicial review of the Commissioner's final decision, *see* 42 U.S.C. § 405(g); (R. 1), and the parties have consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 7).

## Facts

In the years leading up to her claimed disability onset date, Moore finished one semester of college courses and worked as a personal assistant, a sales associate in a department store, and a mail handler with the U.S. Postal Service. (A.R. 39-41.) She claims that in February 2009, when she was 42 years old, she became disabled by chronic pain in her back and knees. (Id. at 44, 160.) Moore was represented by counsel at her hearing before the ALJ, where she presented documentary and testimonial evidence in support of her claims.

## A. Medical Evidence

In April 2009, two months after her claimed disability onset date, Moore visited Dr. Louis Rohr, her treating physician. Moore complained of left elbow pain and vertigo when changing positions. (A.R. 279-80.) Dr. Rohr recorded her height as five feet five inches and her weight as 343 pounds. (Id. at 279.) He recommended weight loss and over the counter anti-inflammatory medication, and

wrote that her knee pain was "resolved." (Id.) Moore moved to Iowa shortly after this visit so the next time she saw Dr. Rohr was six months later when she reported being able to "walk a distance" unless her back was hurting. (Id. at 281-82.) Dr. Rohr noted that she had 1+ pitting edema on both sides. (Id. at 281.) After that visit there is no evidence that Moore sought out medical treatment for the next year.

Following that treatment gap and after moving back to Chicago, Moore visited Dr. Rohr in October 2010 and again reported that she was not in any pain. (Id. at 283-84, 299.) Dr. Rohr observed that she had run out of medication three weeks prior but that her leg swelling and hypertension had both resolved while she was off medication. (Id. at 283-84.) Moore next saw Dr. Rohr in June 2011 when she complained of sharp low back pains and pain in her right knee that was usually present while she was walking. (Id. at 285-86.) Notes from this appointment show that Moore's weight had increased to 385 pounds and that she was not taking pain medication. (Id. at 285.) Dr. Rohr wrote that her pain was likely caused by early osteoarthritis because of her obesity and he prescribed weight loss and Tylenol. (Id.)

Six months later, in December 2011, Moore returned to Dr. Rohr complaining of right ankle pain, low-back pain, and discomfort in her hip and groin. (Id. at 289.) Although she reported that her ankle pain got worse with walking, she told Dr. Rohr that it improved with Ibuprofen and that she was walking for exercise. (Id.) Dr. Rohr described Moore as having morbid obesity and anemia but noted that

she had no joint swelling or tenderness and no point tenderness in her back. (Id. at 289-90.) Dr. Rohr ordered an MRI of Moore's lumbosacral spine which showed probable degenerative disc disease at L3/4 and L5/S1 with facet joint arthropathy. (Id. at 292.) Dr. Rohr saw Moore again in February 2012 when she reported pain in her right knee and a painful left ankle. (Id. at 294.) Moore had been taking Naproxen for pain but she reported that it did not help her. (Id.) Dr. Rohr examined her and noted no effusion or crepitus but observed that she had tenderness in her medial joint line in her knees and in her ankle joint as well. (Id. at 295.) He increased Moore's Naproxen dosage to 500 mg and added a topical cream to treat her pain. (Id.) He also ordered an MRI of her knees, which showed mild to moderate bilateral bicompartmental degenerative changes with mild bilateral suprapatellar effusion. (Id. at 312.)

In late February 2012, Moore reported to an emergency room after falling down and injuring her right ankle. (Id. at 344.) The hospital records show that she suffered soft tissue swelling but no fracture or other bony abnormality. (Id.) The following week Dr. Rohr evaluated Moore and characterized her injury as an ankle sprain, for which she was given Ibuprofen and Tylenol 3. (Id. at 365-67.) He noted that Moore was following instructions to use an ankle splint and crutches and that he observed mild lateral swelling around her ankles and a slight limitation in her ankle extension. (Id.) Moore saw Dr. Rohr a week later for a follow-up and complained that although she had stopped using crutches and her ankle splint, her ankle was still hurting. (Id. at 421.) Dr. Rohr observed that she still had mild

ankle swelling but noted that she had normal strength in her ligaments and walked without a limp.  (Id. at 422.)

In March 2012, Moore underwent a consultative examination with internal medicine specialist Dr. Roopa Karri.  (Id. at 320.)  Dr. Karri noted that Moore had 2+ pitting edema in her legs at the time of the exam, but that she was able to get on and off the exam table and walk 50 feet without support.  (Id. at 322.)  She further observed that Moore had swelling and tenderness in her knees, lumbar spine, shoulders, ankles, and feet, and that she could not heel/toe walk, squat, or perform a tandem gait.  (Id.)  Dr. Karri observed in her notes regarding the neurologic exam that Moore "had poor effort and complained of pain."  (Id.)  But later she wrote that Moore's "[o]verall effort and cooperation were excellent."  (Id. at 323.)  In the "Impression" section of her report Dr. Karri wrote that Moore's problems include history of hypertension, history of arthritis in multiple joints with decreased range of motion, anemia, and morbid obesity.  (Id.)

Nine days after the consultative examination, consulting physician Dr. Charles Kenney reviewed the medical records, including Dr. Karri's report, and submitted an opinion regarding Moore's residual functional capacity ("RFC").  (Id. at 325-32.)  Dr. Kenney opined that Moore can stand and walk for six hours and sit for six hours in an eight-hour day.  (Id. at 326.)  He further opined that she could frequently lift 10 pounds but only occasionally engage in postural activities like climbing, balancing, stooping, kneeling, crouching, and crawling.  (Id. at 327.)  In explaining his decision Dr. Kenney wrote that he found Moore's allegations only

partially credible because Dr. Karri reported that she had made poor efforts during testing and because she was able to walk and perform daily activities without assistance. (Id. at 332.) Dr. Kenney opined that Moore's "allegations are exaggerated in comparison with the evidence" he reviewed. (Id.)

In June 2012, Moore visited Dr. Rohr and reported that she had been experiencing constant pain in her right shoulder for over a month and that pain medication was not helping. (Id. at 356.) Dr. Rohr gave her "Ot and musculoskeletal referrals" and recommended that she continue with pain medications and a topical pain relief cream. (Id. at 357.) In August 2012, Moore returned to Dr. Rohr and reported that her knee was hurting and that she was wearing a brace with no relief. (Id. at 428.)

On September 1, 2012, Dr. Rohr filled out a "physical medical source statement" form on Moore's behalf, and wrote that she uses crutches to walk and an ankle brace for support. (Id. at 382-85.) Dr. Rohr opined that she can walk for less than a block without pain, sit for only about four hours in an eight-hour work day, and stand or walk for less than two hours in an eight-hour workday. (Id. at 383.) Dr. Rohr further opined that Moore would need an at-will sit/stand option, that she must walk every 30 minutes for 10 minutes at a time, and that because of her pain she frequently would need unscheduled breaks of 10 to 15 minutes. (Id.) He also wrote that Moore is likely to be off task more than 25% of the work day and absent from work more than four times per month. (Id. at 385.)

That same day, Dr. Rohr filled out a second RFC form for Moore, this one titled "Arthritis Residual Functional Capacity Questionnaire." (Id. at 386-91.) Dr. Rohr noted on the form that he had treated Moore for three to four years about every three months. (Id. at 386.) His RFC findings largely repeated those he set forth in the medical source statement, except in this form Dr. Rohr wrote that Moore could sit for four to six hours (as opposed to only four) and can stand and walk for three to four hours (as opposed to less than two) in an eight-hour day. (Id. at 388.) This time Dr. Rohr wrote that Moore would need to walk for only five minutes (as opposed to 10) every 30 minutes and that she would need unscheduled breaks lasting 5 to 10 minutes (as opposed to 10 to 15). (Id. at 388-89.)

In November 2012 Moore underwent a CT of her ankle which showed a possible tear through her left posterior tibial tendon, small plantar heel spurs, and mild midfoot degenerative changes. (Id. at 405.) The following April, Moore reported to Dr. Rohr complaining of knee and back pain. (Id. at 432-33.) She was only getting minimal relief from Ibuprofen, so Dr. Rohr added a Lidoderm patch for pain relief. (Id.) That same month a radiology report for Moore's thoracic spine showed "multi-level degenerative changes." (Id. at 398.) A follow-up report in August 2013 showed no compression deformities but showed degenerative disc disease and osteophyte formation. (Id. at 403.) The report also described mild disc-space narrowing, but normal anatomic alignment and vertebral body heights. (Id.)

**B.     Moore's Testimony**

Moore testified that on the date of her hearing she was 48 years old and was not looking for work because she was unable to either sit or stand for long periods of time because of excruciating pain in her back and knees.  (A.R. 39, 44.)  Moore testified that she is married but lives alone, and is able to cook, clean, make the bed, do laundry at a laundromat, and shop, although she sometimes gets help with a ride to the store and with bag-carrying.  (Id. at 40, 45-46.)  She testified that her hobbies include cooking and baking and that she sometimes entertains up to 10 people in her home.  (Id. at 47.)  Moore testified that her last job was as a personal assistant, but she left that position because of an interpersonal conflict.  (Id. at 40.)  She explained that she mostly stays at home because even walking a block is difficult (although she is able to use public transportation), so she spends most of her day napping, elevating her feet to relieve swelling, watching TV, listening to the radio, cooking, or reading.  (Id. at 46, 55-56.)  Moore testified that she takes a bus to attend church every Sunday.  (Id. at 56.)

In describing her pain, Moore said that her biggest problem is low-back pain, which usually is at a level of three out of ten when she first wakes up but then gets up to seven or eight by the end of the day.  (Id. at 47-48.)  Moore also described having knee pain about four to five days per week, especially on the left side, which typically is at a five on the pain scale.  (Id. at 49-50.)  Moore stated that she also has arthritic pain and swelling in her feet about three or four days a week, at a level of seven out of ten, and that she has pain in both shoulders.  (Id. at 51-52.)  Moore

testified that she takes Ibuprofen to manage her pain. (Id. at 49-50.) She also said that at her last doctor's appointment, which took place four months before the hearing, she asked for a cane and her doctor agreed that using a cane might help her back and knee pain. (Id. at 52.) Moore testified that she can walk for only a block without taking a break to ease her pain, and that she can sit for only 20 minutes before getting pain in her lower back and knees. (Id. at 54.)

## C.    The Medical Expert's Testimony

Medical expert Dr. Charles Metcalf testified at the hearing after reviewing Moore's medical file. Dr. Metcalf testified that Moore's primary problem is obesity, and that any joint degeneration beyond what would be expected in a person her age is secondary to her weight. (A.R. 62.) He testified that the CT scans and x-rays in the record document only mild joint degeneration. (Id. at 65.) Dr. Metcalf expressed skepticism about Dr. Rohr's RFC opinions, pointing out what he saw as inconsistencies in his reports. (Id. at 66-67.) Dr. Metcalf testified that nothing in the record supports a finding that Moore is unable to sit for 30 minutes and that contrary to Dr. Rohr's opinion, there is no reason why taking a break to walk for 10 minutes would do anything to relieve her joint pain. (Id. at 68.) In Dr. Metcalf's opinion, Moore is capable of lifting 20 pounds occasionally and 10 pounds frequently and can sit for six hours and stand for no more than two hours in an eight-hour day. (Id. at 70-71.) Dr. Metcalf did not think that the records reflecting Moore's anemia would support a finding of fatigue, but he said that "I do think that anyone that weighs 350 or 370 pounds is going to be tired most of the day. I don't think there's

any particular diagnosis of fatigue here. But I—this person's going to be tired a lot." (Id. at 74.) But Dr. Metcalf also testified that there is variability in the amount of activity that people of Moore's weight can sustain, and that some people of her weight are still "quite active." (Id. at 75.)

**D.    The ALJ's Decision**

On March 26, 2014, the ALJ issued a decision denying Moore's claims for DIB and SSI. (A.R. 27.) After determining that Moore meets the insured status requirements of the Act, the ALJ engaged in the required five-step process used to evaluate DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At steps one and two, respectively, the ALJ determined that Moore has not engaged in substantial gainful activity since her alleged onset date and that she has severe impairments in the form of morbid obesity, degenerative joint disease, and anemia. (A.R. 15.) At step three, the ALJ concluded that Moore's impairments, either singly or in combination, do not meet any listed impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, including the listings for major dysfunction of a joint or disorders of the spine. (Id. at 16.)

Before turning to step four, the ALJ assessed Moore as having an RFC to perform sedentary work with restrictions against ever climbing ladders, ropes, or scaffolds, and with limitations to stooping, kneeling, crouching, or crawling less than 20% of the time in an eight-hour workday. (Id.) The ALJ further restricted Moore to climbing ramps or stairs only two times a day and to using a cane for balance. (Id.) In reaching the RFC determination the ALJ accounted for the impact

Moore's obesity would have on her degenerative joint disease symptoms and analyzed the factors contributing to her conclusion that Moore's symptom allegations are less than fully credible. (Id. at 17.) The ALJ also explained that she had given little weight to treating physician Dr. Rohr's opinions, based on what she found to be his inconsistent statements on the two RFC evaluations, internal inconsistencies in those evaluations, a lack of objective evidence supporting the extreme restrictions Dr. Rohr assigned, and the relatively mild medications he prescribed. (Id. at 22-24.) Based on the assigned RFC, the ALJ determined that Moore could not return to any past relevant work, but concluded that she could perform other jobs that exist in significant numbers in the national economy, including address clerk, telephone clerk, and order clerk. (Id. at 25-26.) Accordingly, the ALJ concluded that Moore is not disabled within the meaning of the Act. (Id. at 27.)

## Analysis

In moving for summary judgment, Moore raises three main challenges to the ALJ's RFC decision. First, she argues that in developing the RFC the ALJ overlooked what she describes as limitations stemming from her need to nap during the day. Second, she argues that the ALJ improperly analyzed her sitting limitations by failing to fully account for Moore's obesity and lumbar condition. Finally, Moore argues that the ALJ improperly evaluated her symptoms by giving what she characterizes as vague and unsupported reasons for finding her testimony less than credible. This court reviews the ALJ's decision only to ensure that it is

supported by substantial evidence, "meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Minnick*, 775 F.3d at 935 (internal quotation and citation omitted). Under the substantial evidence standard the court neither reweighs the record nor second-guesses the ALJ's judgment. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Instead, even if reasonable minds could disagree as to whether the claimant is disabled, *see Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015), the court will affirm as long as the ALJ's decision is free from legal error and supported by "a logical bridge from the evidence" to the ALJ's conclusion, *see Shideler*, 688 F.3d at 310 (quotation omitted).

Before addressing the arguments Moore has raised in her brief, a pause is warranted to point out that the applicable standard of review has particular salience in a case like this, where the medical evidence showing that Moore's BMI went as high as 59, (A.R. 20, 290), could easily lead a reasonable person to conclude that the combination of her weight and degenerative joint disease would make it difficult for Moore to fulfill the requirements of even a limited range of sedentary work on a day-to-day basis. The Seventh Circuit has recognized that morbid obesity "might make it difficult for [a claimant] to sit for long periods of time, as sedentary work normally requires," *Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014), and that the combination of obesity near Moore's level and arthritis would make standing for even two hours painful, *see Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004). As the Seventh Circuit put it, "[i]t is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40."

*Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). The Court has also expressed skepticism that a morbidly obese person with back pain can even occasionally crawl, stoop, and crouch. *See Goins v. Colvin*, 764 F.3d 677, 682 (7th Cir. 2014). But Moore has not challenged the ALJ's opinion with respect to the assigned postural limitations, and unlike the situations in *Browning*, *Barrett*, *Martinez*, and *Goins*, here the ALJ explicitly considered how Moore's obesity combines with her other impairments and pointed to evidence supporting her conclusion that despite the likelihood that her obesity exacerbates her pain, Moore is able to function within the limits of the assigned RFC. (A.R. 17, 20-22.) That reasonable minds might read the record differently is irrelevant under the standard of review, which precludes this court from reweighing the evidence or replacing the ALJ's judgment with respect to whether Moore is disabled. *See Stepp*, 795 F.3d at 718 ("We are not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." (quotation and citation omitted)). With the substantial evidence standard firmly in mind, the court will evaluate the arguments that Moore has raised to challenge the ALJ's decision.

## A.    Symptom Evaluation

The court begins its analysis with Moore's argument regarding the ALJ's evaluation of her symptoms, especially her pain, because an erroneous symptom assessment in many cases renders the entire decision unsupported. *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) ("An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ

explains that the decision did not depend on the credibility finding."). Moore argues that the ALJ's credibility determination should be overturned because, she says, the ALJ overlooked relevant evidence, erroneously characterized her treatment as conservative, and improperly leaned on what the ALJ found to be a lack of supporting objective evidence. (R. 17, Pl.'s Mem. at 13-15.) Moore's challenge to the ALJ's symptom evaluation faces a high hurdle, because an ALJ's credibility determination will only be overturned if it is "patently wrong." *See Minnick*, 775 F.3d at 937 (quotation and citation omitted). And an ALJ's credibility determination is patently wrong only if it "lacks any explanation or support." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014).

Moore argues that the ALJ failed to follow the requirements of SSR 96-7p in evaluating the credibility of her symptom descriptions because she employed boilerplate language characterizing her statements as "not entirely credible." (R. 17, Pl.'s Mem. at 13.) After Moore filed her opening brief, the SSA replaced SSR 96-7p with new guidance eliminating the use of the term "credibility" from the symptom evaluation process, but clarifying that the factors to be weighed in that process remain the same. *See* SSR 16-3p, 2016 WL 1119029, at *1, *7 (effective March 28, 2016). The new ruling makes clear that ALJs "aren't in the business of impeaching claimants' character," but does not alter their duty to "assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). As for Moore's

objection to the ALJ's use of boilerplate language, the Seventh Circuit has repeatedly held that where, as here, the ALJ provides supported reasons for discounting the claimant's symptom description, use of the boilerplate language is harmless. *See Fody v. Colvin*, 641 Fed. Appx. 568, 573 (7th Cir. 2016); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Moore takes the ALJ to task for discounting her testimony based on her determination that Moore's doctors had prescribed only "conservative treatment." (A.R. 17.) Specifically, the ALJ wrote that "[t]wo very significant factors weighing against the claimant's credibility in this case are (1) the treatment the claimant has sought and received and (2) the type, dosage, effectiveness, and side effects of her medications." (Id.) She explained that Dr. Rohr prescribed only a topical capsaicin cream and 500 milligrams of naproxen a day to treat her pain, which he switched to Ibuprofen in 2013, and noted that it would be reasonable to expect more treatment "in a case involving severe, intractable pain." (Id.) According to Moore, there is no record basis for the ALJ's assumption that the standard of care for someone with degenerative joint disease compounded by obesity is more aggressive treatment than that prescribed by Dr. Rohr, so this aspect of the symptom evaluation amounts to the ALJ inappropriately "playing doctor." (R. 17, Pl.'s Mem. at 14.)

Although Moore is correct that an ALJ must avoid "playing doctor" by substituting her judgment for a physician's with respect to proper treatment, *see Goins*, 764 F.3d at 680, the regulations require an ALJ evaluating a claimant's symptoms to weigh both the nature of the claimant's treatment and the type,

dosage, effectiveness, and side effects of medications, *see* 20 C.F.R. § 404.1529(c)(3), 416.929(c)(3). That is what the ALJ did here. As the ALJ pointed out, Dr. Rohr noted that Moore was not having side effects from her medication, (A.R. 387), but never increased her medication dosage after February 2012, (id. at 19). And although prescription-strength Ibuprofen may be a common treatment for arthritis, *see Hill v. Astrue*, 295 Fed. Appx. 77, 82 (7th Cir. 2008), the ALJ was entitled to rely on Moore's failure to seek out treatment from specialists or engage with "physical therapy or other treatment modalities" in concluding that the treatment she sought was out-of-proportion to her allegations of "excruciating" pain. (A.R. 17, 44.) Moreover, the ALJ observed that there was a year-long gap in Moore's treatment history following her claimed onset date, and in June 2011 she told Dr. Rohr that she was not taking any pain medications. (Id. at 19, 24.) The ALJ also highlighted records showing that at more than one visit after her claimed disability onset date Moore reported having no pain at all. (Id. at 18-19.) All of those observations support the ALJ's conclusion that Moore's treatment history is out of step with the severity of pain she alleges.

Moore's final argument with respect to symptom evaluation is that the ALJ erred in holding a lack of corroborating objective evidence against her and failing to, in her words, consider that her "obesity alone constitutes objective evidence which supports her alleged limitations." (R. 17, Pl.'s Mem. at 14-15.) Although Moore is correct that an ALJ may not discount a claimant's pain allegations *solely* because they are unsupported by objective evidence, the lack of corroborative medical

records is one among many factors that the ALJ must consider in weighing the claimant's symptom allegations. *See* 20 C.F.R. § 404.1529(c); *Pierce*, 739 F.3d at 1050-51; *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009). That is because "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *see also Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (noting that "a discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration"). And because Moore's pain complaints stem from arthritis, "this is not a situation where a claimant's pain was from an undetermined source, making self-reports the only available evidence of severity." *See Spies v. Colvin*, 641 Fed. Appx. 628, 634 (7th Cir. 2016). Here, in addition to pointing out factors like the limited nature of Moore's medications, the treatment gap, her failure to seek out help from specialists, her occasional reports that she was in no pain, and the absence of physical therapy, the ALJ properly assessed the objective medical records. *See* SSR 16-3p, 2016 WL 1119029, at *4, *7 (listing relevant factors in evaluating symptoms, including type, dosage, and effectiveness of medication, treatment other than medication, and frequency of pain symptoms, and noting that ALJ must consider "the entire case record, including the objective medical evidence"). The ALJ described the objective records at length, and noted that "[w]hat stands out" in the imaging reports "is the repeated use of 'mild' by the interpreting radiologists." (A.R. 18.) She noted that Dr. Metcalf testified that those objective records do not support a finding that Moore's walking and

sitting limitations are as severe as she described.  (Id.)  And contrary to Moore's assertion, the ALJ considered the objective evidence of her obesity, acknowledged that her weight "very likely exacerbates the degenerative joint disease symptoms," and factored that evidence into the analysis of her symptoms and RFC.  (Id. at 17, 20.)  Because the articulated reasons are supported by the evidence, Moore has not shown that the ALJ's decision to discount her description of her symptoms was "patently wrong."  *See Filus*, 694 F.3d at 869.

## B.    Fatigue Symptoms

Moore also argues that the ALJ's decision should be reversed because the ALJ failed to properly evaluate the evidence surrounding her fatigue or to include in the RFC assessment any limitation related to her need to nap during the day. (R. 17, Pl.'s Mem. at 8-11.)  To the extent Moore is arguing that the ALJ should have relied on Moore's testimony and symptom descriptions in evaluating her need to nap, the ALJ was not required to incorporate into the RFC limitations that she did not find to be credible.  *See Outlaw v. Astrue*, 412 Fed. Appx. 894, 898 (7th Cir. 2011).  And as explained above, the ALJ's evaluation of the credibility of Moore's symptoms survives judicial review.  To the extent that Moore faults the ALJ for failing to specifically say whether she found Moore's nap-related statements credible, the ALJ was not required to assess the credibility of her statements on a symptom-by-symptom basis.  *See Shideler*, 688 F.3d at 312 (noting that "an ALJ's credibility findings need not specify which statements were not credible," including claimant's assertion that he "needed to lie down several times per day"); *Jens v.*

*Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *McCurrie v. Astrue*, 401 Fed. Appx. 145, 149 (7th Cir. 2010). And in any event, rather than describing napping as a medical necessity, Moore only brought up napping at the hearing as part of her description of how she chooses to spend her days. (A.R. 55-56.)

The only evidence besides her own statements that Moore points to in support of her contention that the RFC must include a nap-related limitation is the testimony of Dr. Metcalf, whose opinions the ALJ gave great weight. (Id. at 22.) Dr. Metcalf testified that although the record does not reflect any diagnosis of fatigue, he thought "anyone that weighs 350 or 370 pounds is going to be tired most of the day." (Id. at 74.) But contrary to Moore's assertions, the ALJ did not ignore this testimony. The ALJ acknowledged Dr. Metcalf's belief that Moore might experience fatigue related to her obesity, and accommodated that by limiting her walking and standing to two hours. (Id. at 20-21.) Those limitations are consistent with Dr. Metcalf's opinion regarding her RFC. (Id. at 70-71.) The ALJ did not see the need for further fatigue-related restrictions because Moore had not complained of fatigue to her treating doctor, and Dr. Rohr had never discussed fatigue in his notes. (Id. at 20.) And it should be noted that in her brief Moore does not specify what kind of additional functional limitation the ALJ should have incorporated into the RFC beyond the assigned standing and walking limits to properly accommodate her fatigue.

Moreover, the cases Moore cites to support her argument that the ALJ insufficiently considered the fatigue evidence are all distinguishable either because

the ALJ did not properly support an adverse credibility finding with respect to the claimant's testimony, *see Catania v. Astrue*, No. 11 CV 4675, 2013 WL 441171, at *10 (N.D. Ill. Feb. 4, 2013); *Andrews v. Astrue*, No. 09 CV 6806, 2011 WL 3296393, at *7-8 (N.D. Ill. July 29, 2011), failed to make any credibility determination with respect to the claimant's pain and attendant fatigue, *see Cuevas v. Barnhart*, No. 02 CV 4336, 2004 WL 1588277, at *15-16 (N.D. Ill. July 14, 2004), ignored a whole line of evidence related to fatigue, *see Holland v. Barnhart*, No. 02 CV 8398, 2003 WL 22078383, at *9 (N.D. Ill. Sept. 5, 2003), or misconstrued medical records documenting a claimant's fatigue complaints, *see Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1046 (N.D. Ind. 2010). Here the ALJ acknowledged the limited evidence related to fatigue and explained how she incorporated it into the RFC. And importantly, Moore did not testify that she must nap for a specific amount of time every day, only that napping is part of her daily routine, so there is no evidence that her naps translate to a functional limitation. (A.R. 55-56.) For these reasons, Moore has not shown that the ALJ committed reversible error in failing to include additional fatigue-related limitations in the RFC assessment.

## C.   Sitting Restrictions

Lastly, Moore argues that the ALJ failed to properly assess her sitting limitations because, according to her, the ALJ insufficiently analyzed her testimony regarding her pain when sitting, Dr. Rohr's opinion that she can sit for less than six hours a day, or Dr. Metcalf's testimony that Moore would require "some option to move position" while sitting. (R. 17, Pl.'s Mem. at 13.) With respect to the ALJ's

treatment of Moore's testimony that pain limits her ability to sit, as discussed above, the ALJ's explanation for why she discounted Moore's pain allegations is not patently wrong.  With respect to Dr. Rohr's opinion that Moore can sit either for about four hours or for four to six hours a day, the ALJ thoroughly explained why she found those opinions to be entitled to little weight.  Although generally an ALJ should "give more weight to the opinions of treating physicians because they are most familiar with the claimant's conditions and circumstances," an ALJ may discount the opinion if there are "good reasons" to do so.  *Israel v. Colvin*, __ F.3d __, 2016 WL 6135856, at *3 (7th Cir. Oct. 21, 2016).  In determining what weight to give the treating physician's opinion, the ALJ must consider factors like the length and frequency of the treating relationship, the nature and extent of the treatment relationship, the supportability of the doctor's opinion, whether the doctor is a specialist in the relevant area, and whether the opinion is consistent with the evidence as a whole.  *See* 20 C.F.R. § 404.1527(c); *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014).

Here, the ALJ gave a number of good reasons to explain why she gave Dr. Rohr's opinions only "little weight."  (A.R. 23.)  She explained that even though Dr. Rohr submitted two opinions on the same day, there were non-trivial differences between the two with respect to her need for breaks and her sitting, standing, and walking limitations.    (Id.)   The ALJ explained that there were internal inconsistencies including Dr. Rohr's opinion that Moore is both unable to walk a city block and must spend 10 minutes walking every half-hour.  (Id.)  The ALJ pointed

out that Dr. Rohr pointed to almost no objective findings to support his opinions, and the opinions do not reflect conditions set forth in his treatment notes. (Id.) All of these reasons are supported by the record and therefore justify the ALJ's decision to discount Dr. Rohr's opinion.

The ALJ explained that she relied heavily on Dr. Metcalf's opinion and gave moderate weight to consulting physician Dr. Kenney's opinion in concluding that Moore retains the sitting capacity necessary for sedentary work. (Id. at 21-22.) The ALJ noted that Dr. Metcalf reviewed the entire longitudinal record and tied his opinions to the results of the diagnostic imaging, which showed only mild to moderate degenerative changes. (Id.) Moore faults the ALJ for failing to incorporate what she says was Dr. Metcalf's initial testimony that she needs "some option to move position with sitting," but that argument obscures his actual testimony. (See R. 17, Pl.'s Mem. at 13.) Dr. Metcalf explained that when he first reviewed the record his conclusion was that Moore would be able to stand or sit for six hours with "some option to move position," but as he went over the record again he revised his opinion to require her to stand for two hours at most, but sit for six. (A.R. 70-71.) With that more restrictive standing limitation, Dr. Metcalf did not say she requires a sit/stand option with the limitations the ALJ incorporated into the RFC. (Id. at 71.) Because the ALJ's conclusions regarding Moore's sitting limitations are supported by the consulting physicians' opinions, Moore has not shown that the ALJ failed to sufficiently consider how Moore's impairments limit her ability to sit in assessing her RFC. *See Sienkiewicz*, 409 F.3d at 803 (affirming

ALJ's decision relying on consulting physicians' opinions rather than claimant's testimony in assigning sitting limitations).

## Conclusion

There is no doubt that reasonable minds could review the evidence in this case and disagree as to whether the combination of Moore's obesity and pain renders her disabled. But this is not a case where the ALJ failed to grapple with Moore's obesity or overlooked record evidence regarding the interplay of her obesity and degenerative joint and disc diseases. Instead, the ALJ evaluated the evidence and gave supported reasons for concluding that Moore does not meet the Act's standards for disability. The applicable standard of review precludes this court from reweighing the evidence or substituting its judgment for the ALJ's decision. Because the ALJ's decision is supported by substantial evidence, Moore's motion for summary judgment is denied, the government's is granted, and the Commissioner's final decision is affirmed.

**ENTER:**

Young B. Kim
**United States Magistrate Judge**